RECORD NO. 12-2076

In The
# United States Court of Appeals
### For The Fourth Circuit

## STEVEN WAYNE THOMAS,

*Plaintiff – Appellee*,

**v.**

## R. V. HOLLY, individually, *et al.*,

*Defendants – Appellants*,

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT RALEIGH**

————————

**BRIEF OF APPELLEE**

————————

**Kieran J. Shanahan**
**Brandon S. Neuman**
**John E. Branch, III**
**SHANAHAN LAW GROUP, PLLC**
**128 East Hargett Street, Suite 300**
**Raleigh, North Carolina  27601**
**(919) 856-9494**

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __12-2076__    Caption: __Thomas (Plaintiff-Appellee) v. Holly et al. (Defendants-Appellants)__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Steven Wayne Thomas__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
          (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Kieran J. Shanahan                          Date:        09/19/2012

Counsel for: Steven Wayne Thomas (Appellee)

## CERTIFICATE OF SERVICE
**************************

I certify that on        09/19/2012        the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Kieran J. Shanahan                                            09/19/2012
(signature)                                                      (date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iv

ISSUE PRESENTED .........................................................................1

STATEMENT OF THE CASE..............................................................1

STATEMENT OF FACTS ...................................................................3

    A.    Officer Matthews Arrives at the Scene ...................................3

    B.    Thomas and Gross Ask Officer Matthews for Help, and Matthews Responds by Tasing Thomas.................................5

    C.    Defendants Babb and Estes Use Deadly Force Against Thomas, Punching and Kneeing Him in the Face and Fracturing His Jaw ........8

    D.    Thomas is Tased by LCSD Officers Multiple Times After Being Arrested, Handcuffed, and Subdued.........................10

SUMMARY OF THE ARGUMENT .....................................................12

STANDARD OF REVIEW .................................................................14

ARGUMENT .................................................................................17

    I.    DEFENDANTS MATTHEWS, BABB, ESTES, AND GILSTRAP ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON THOMAS'S CLAIMS UNDER 42 U.S.C. § 1983 BECAUSE THEY VIOLATED CLEARLY ESTABLISHED CONSTITUTIONAL LAW BY USING EXCESSIVE FORCE AGAINST THOMAS ...................................17

        A.    Qualified Immunity Standard ...................................19

i

B.   Defendants Matthews, Babb, Estes, and Gilstrap Violated Thomas's Fourth Amendment Rights by Using Excessive Force Against Him ...................................................................20

    1.   Severity of the Crime: The Crimes for Which Thomas was Arrested are Misdemeanors That Carry Minor Penalties.....................................................21

    2.   Immediate Threat to the Safety of the Officers or Others: Thomas Posed Little Threat When Initially Tased by Defendant Matthews, No Threat when Subjected to Deadly Force by Defendants Babb and Estes, and Was Already In Custody When Tased by Defendants Gilstrap and Babb ......................25

    3.   Resisting or Evading Arrest: Thomas was Not Under "Arrest" When Initially Tased by Defendant Matthews, and Offered Only Minimal Resistance Before He Was Subjected to Deadly Force by Defendants Babb and Estes .............................................30

    4.   The Extent of the Plaintiff's Injuries: Thomas's Injuries, Which Included a Broken Jaw and Required Surgery, Were Unnecessary Given His Minor Criminal Violations, the Lack of a Threat He Posed to Defendants, and the Minimal Nature of His Resistance ............................................................33

C.   Thomas's Expert Only Offered Testimony Regarding the Reasonableness of Defendants' Actions under Defendants' Version of the Facts—Not with the Facts Viewed in the Light Most Favorable to Thomas .....................34

D.   Thomas's Right to Be Free From Excessive Force During Seizure Was Clearly Established at the Time of the Altercation, and Defendants had "Fair Warning" That Their Use of Force Was Unconstitutional ................................38

E.    Defendants Gilstrap and Babb Also Violated Thomas's Constitutional Rights by Tasing Him After He Had Been Handcuffed, Taken into Custody, and Subdued ......................44

II.    DEFENDANTS CARTER, MARCUM, SMITH, ALLEN, MELTON, AND LLOYD ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON THOMAS'S BYSTANDER LIABILITY CLAIMS BECAUSE THERE ARE ISSUES OF MATERIAL FACT REGARDING WHETHER THEY KNEW THOMAS'S CONSTITUTIONAL RIGHTS WERE BEING VIOLATED, HAD A REASONABLE OPPORTUNITY TO PREVENT THE HARM, AND CHOSE NOT TO ACT...................47

III.    DEFENDANTS MATTHEWS, BABB, GILSTRAP, AND ESTES ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON THOMAS'S INTENTIONAL TORT CLAIMS BECAUSE THEIR USE OF EXCESSIVE AND UNREASONABLE FORCE AGAINST THOMAS CONSTITUTES ASSAULT AND BATTERY UNDER NORTH CAROLINA LAW ..................49

IV.    DEFENDANTS MATTHEWS, BABB, GILSTRAP, AND ESTES ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THOMAS'S STATE LAW TORT CLAIMS BECAUSE THE "PUBLIC OFFICER'S IMMUNITY" DOCTRINE DOES NOT APPLY TO INTENTIONAL TORTS ......................................50

CONCLUSION .........................................................................................55

REQUEST FOR ORAL ARGUMENT ..................................................55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................14

*Anderson v. Russell*,
  247 F.3d 125 (4th Cir. 2001) .........................................................17

*Barnett v. Karpinos*,
  119 N.C. App. 719, 460 S.E.2d 208 (1995) ...................................53

*Board v. Farhham*,
  394 F.3d 469 (7th Cir. 2005) .........................................................38

*Boitnott v. Corning, Inc.*,
  669 F.3d 172 (4th Cir. 2012) ................................................... 14-15

*Bostic v. Rodriguez*,
  667 F. Supp. 591 (E.D.N.C. 2009). ...............................................54

*Bradley v. Ramsey*,
  329 F. Supp. 2d 617 (W.D.N.C. 2004)....................................50, 53

*Brown v. Winders*,
  No. 5:11-CV-176-FL,
  2011 WL 4828840 (E.D.N.C. Oct. 11, 2011)................................50

*Campbell v. Anderson*,
  156 N.C. App. 371, 576 S.E.2d 726 (2003) ...................................53

*Caricofe v. Mayor and & City Council of Ocean City, Maryland*,
  32 Fed. Appx. 62 (4th Cir. 2002) ..................................................43

*Clem v. Corbeau*,
  284 F.3d 543 (4th Cir. 2002) ..................................................21, 46

*Dempsey v. Halford*,
   183 N.C. App. 637, 645 S.E.2d 201 (2007) .................................................53

*Drewry v. Stevenson*,
   No. WDQ-09-2340,
   2011 WL 1298160 (D. Md. Mar. 31, 2011) ................................................24

*Duran v. Sirgedas*,
   240 Fed. Appx. 104 (7th Cir. 2007) .............................................................43

*Feldman v. Community College of Allegheny*,
   85 Fed. Appx. 821 (3rd Cir. 2004) ...............................................................43

*Franklin v. Montgomery County, Maryland*,
   No. DKC 2005-0489,
   2006 WL 2632298 (D.Md. Sept. 13, 2006).......................................41, 42, 44

*Goodman v. Barber*,
   No. 7:11-CV-00153-F,
   2012 WL 4928873 (E.D.N.C. Oct. 16, 2012)................................................24

*Grad v. Kaasa*,
   312 N.C. 310, 321 S.E.2d 888 (1984) .......................................51, 52, 53, 54

*Grad*, *Kitchen ex rel. Kitchen v. Halifax County*,
   192 N.C. App. 559, 665 S.E.2d 760 (2008) .................................................53

*Graham v. Connor*,
   490 U.S. 386 (1989)...................................................................................*passim*

*Gray v. Torres*,
   No. WDQ-08-1380,
   2009 WL 2169044 (D. Md. July 17, 2009) ..................................................42

*Greenidge v. Ruffin*,
   927 F.2d 789 (4th Cir. 1991) .......................................................................17

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982).....................................................................................19

*Harrell v. City of Gastonia*,
    No. 3:07CV396-H,
    2009 WL 234064 (W.D.N.C. 2009), *aff'd on other grounds*,
    392 Fed. Appx. 197 (4th Cir. 2010) ............................................................53

*Hawkins v. State*,
    117 N.C. App. 615, 453 S.E.2d 233 (1995) ....................................................54

*Henry v. Purnell*,
    501 F.3d 374 (4th Cir. 2007) ..........................................................................19

*Henry v. Purnell*,
    652 F.3d 524 (4th Cir. 2011) ....................................................................19, 24

*Hope v. Pelzer*,
    536 U.S. 730 (2002)...................................................................38, 39, 40, 44

*Howie v. Prince George's County, Maryland*,
    No. DKC 2006-3465,
    2009 WL 2426018 (D. Md. Aug 5, 2009) .......................................................15

*In re Allen*,
    106 F.3d 582 (4th Cir. 1997) ..........................................................................19

*Jones v. Buchanan*,
    325 F.3d 520 (4th Cir. 2003) ....................................................21, 22, 33, 45

*Kane v. Hargis*,
    987 F.2d 1005 (4th Cir. 1993) ...........................................................34, 41, 44

*Largie v. Gerres*,
    No. WDQ-11-2765,
    2012 WL 1965450 (D. Md. May 30, 2012) .....................................................24

*Lea v. Kirby*,
    171 F. Supp. 2d 579 (M.D.N.C. 2001) ...........................................................53

*Mandsager v. Univ. of North Carolina at Greensboro*,
    269 F. Supp. 2d 662 (M.D.N.C. 2003) ....................................................50-51

vi

*McConnell v. Griffith*,
No. 5:08CV113,
2010 WL 420051 (N.D. W.Va. Jan. 29, 2010)...............................................24

*Miranda v. Arizona*,
384 U.S. 436 (1966)....................................................................................13

*Mistead v. Kibler*,
243 F.3d 157 (4th Cir. 2001) .......................................................................17

*Myrick v. Cooley*,
91 N.C. App. 209, 371 S.E.2d 492 (1988) ...................................................49

*Nail v. Gutierrez*,
No. 1:06-CV-292 PS,
2008 WL 4545332 (N.D. Ind. Oct. 10, 2008) .........................................43, 44

*Pearson v. Callahan*,
555 U.S. 223 (2009)....................................................................................19

*Powers v. Germaine*,
No. 7:06-CV-187-D,
2008 WL 2756383 (E.D.N.C. 2008) ............................................................53

*Randall v. Prince George's Cnty., Md.*,
302 F.3d 188 (4th Cir. 2002) .......................................................................48

*Ricciuti v. N.Y.C. Transit Authority*,
124 F.3d 123 (2d Cir. 1997) ........................................................................47

*Ross v. Commc'ns Satellite Corp.*,
759 F.2d 355 (4th Cir. 1985), *overruled on other grounds by*,
*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989)....................................................................................15

*Rowland v. Perry*,
41 F.3d 167 (4th Cir. 1994) ................................................................*passim*

*Russ v. Causey*,
732 F. Supp. 2d 589 (E.D.N.C. 2010) ....................................................50, 53

*Saucier v. Katz*,
    533 U.S. 194 (2001)........................................................................19, 38, 44

*Slattery v. Rizzo*,
    939 F.2d 213 (4th Cir. 1991) ....................................................................25

*Smith v. Hefner*,
    235 N.C. 1, 68 S.E.2d 783 (1952) ..............................................50, 52, 53, 54

*Smith v. Ray*,
    409 Fed. Appx. 641 (4th Cir. 2011) ...........................................................24

*Smith v. State*,
    289 N.C. 313, 222 S.E.2d 412 (1976) ...................................................52, 53

*Standard Pacific of the Carolinas, LLC v. Amerisure Ins. Co.*,
    No. 11-1444,
    2012 WL 6604614 (4th Cir. Dec. 19, 2012).................................................14

*Strickland v. Hedrick*,
    194 N.C. App. 1, S.E.2d 61 (2008) ...........................................................53

*Tennessee v. Garner*,
    471 US 1 (1985)...................................................................................21, 43

*Thomas v. Sellers*,
    142 N.C. App. 310, 542 S.E.2d 283 (2001) ................................................53

*Vizbaras v. Prieber*,
    761 F.2d 1013 (4th Cir. 1985) ..............................................................39, 40

*Wells v. North Carolina Dept. of Corr.*,
    152 N.C. App. 307, 567 S.E.2d 803 (2002) ...........................................51, 53

*Wilkins v. Gaddy*,
    – U.S. –, 130 S. Ct. 1175 (2010) ...............................................................45

*Williams v. Sandel*,
    433 Fed. Appx. 353 (6th Cir. 2011) ..........................................................44

*Wilson v. Flynn*,
    429 F.3d 465 (4th Cir. 2005) .......................................................................43

*Wilson v. Kittoe*,
    337 F.3d 392 (4th Cir. 2003) ..................................................14, 16, 23, 24

*Young v. Prince George's County, Maryland*,
    355 F.3d 751 (4th Cir. 2004) .......................................................................15

## **CONSTITUTIONAL PROVISION**

U.S. Const. amend. IV ...................................................................*passim*

U.S. Const. amend. XIV ...........................................................................45

## **STATUTES**

42 U.S.C. § 1983 ............................................................................*passim*

N.C. Gen. Stat. § 14-147 ..........................................................................23

N.C. Gen. Stat. § 14-223 ..........................................................................23

N.C. Gen. Stat. § 14-288.4 .......................................................................23

## **RULE**

Fed. R. Civ. P. 56(c) .................................................................................14

## **OTHER AUTHORITY**

*Black's Law Dictionary* (9th ed. 2009).....................................................54

Restatement (Second) of Torts § 868 (2012) .....................................52

## ISSUE PRESENTED

Whether the United States District Court for the Eastern District of North Carolina properly denied Defendants' motion for summary judgment on Plaintiff's claims of excessive force and bystander liability under 42 U.S.C. § 1983 and Plaintiff's North Carolina tort claims.

## STATEMENT OF THE CASE

On April 27, 2009, Plaintiff Steven Wayne Thomas ("Thomas") was involved in an altercation with members of the Lee County Sheriff's Department ("LCSD"), most notably officers Justin Matthews ("Matthews"), Ken Gilstrap ("Gilstrap"), Clint Babb ("Babb"), and Brian Estes ("Estes"). Matthews responded to a report that Plaintiff was damaging a decorative fence on residential property near a rural intersection near Sanford, North Carolina. After Matthews arrived at the scene, he panicked and caused a physical confrontation during which Thomas was tased three times, sprayed with pepper spray, and tackled by his friend Josh Gross ("Gross"). With assistance from Gross and other LCSD officers who arrived at the scene, Matthews subdued Thomas. During the struggle, Defendants tased Thomas an additional seven times and kneed and punched him in the face and head, breaking his jaw. After his arrest, Thomas was held for four days and three nights without access to counsel or family.

Thomas filed this matter on February 9, 2010, asserting fifty-one (51) causes of action under both federal and North Carolina law against Lee County, the LCSD, Sheriff Tracy Carter ("Carter"), the officers involved in Thomas's arrest, and the North Carolina Department of Corrections. (JA 23–96). Among Thomas's claims were allegations of excessive force, bystander liability, inadequate training, and failure to supervise under 42 U.S.C. § 1983; state law claims for assault, battery, invasion of privacy, gross negligence, negligence, and false imprisonment; and claims for punitive damages under both federal and state law. *Id.*

On March 31, 2010, Thomas voluntarily dismissed several of defendants in this matter. (JA 461, 469). In addition, the United States District Court for the Eastern District of North Carolina dismissed, *inter alia*, Thomas's claims against the deputies in their official capacities on August 4, 2010. (JA 689).

On February 7, 2012, the remaining Defendants moved for summary judgment. (JA 694–696). In response, Plaintiff abandoned some claims, including § 1983 claims against certain individual defendants, claims under the North Carolina Constitution, and a number of state-law tort claims. (JA 2143). Plaintiffs' remaining causes of action consist of: (a) § 1983 excessive force claims against Defendants Matthews, Gilstrap, Babb, and Estes in their individual capacities; (b) § 1983 bystander liability claims against Defendants Carter, M.D. Smith, Mark Melton, R.V. Holly, Don Lloyd, Bill Marcum, and Bryan Allen in their individual

capacities; (c) state-law assault and battery claims against Defendants Matthews, Gilstrap, Babb, Estes, and Holly in their individual capacities; and (d) punitive damages claims against Defendants Matthews, Gilstrap, Babb, Holly, and Estes in their individual capacities. *Id.*

On July 18, 2012, Defendants' motion for summary judgment was heard by Honorable Terrence W. Boyle. On August 13, 2012, Judge Boyle entered an Order denying Defendants' motion for summary judgment. (JA 4578–4589). Defendants appealed on August 30, 2012. (JA 4590–4592).

## STATEMENT OF FACTS

Plaintiff Thomas is a 32-year-old farmer who lived in either Lee or Harnett County his entire life. His father and he farm approximately 2,400 acres of land in Lee County. (JA 2695, 2706).

### A.     Officer Matthews Arrives at the Scene.

At approximately 2:13 p.m. on April 27, 2009, LCSD Deputy Matthews ("Matthews") responded to a report of property damage at the rural intersection of St. Andrews Church Road and Meadowview Road, near Sanford, North Carolina. (JA 3335). Deputy Matthews heard no report of activity other than property damage. *Id.*[1] At the time, Matthews was a 24-year-old rookie with the LCSD, had

---

[1] Plaintiff is forced to rely on Defendants' testimony regarding the content of the radio communications between the LCSD officers and their dispatch office because, conveniently, Defendants claim there is a five (5) hour time gap on April

not been trained to use a TASER until January 2009, and was not assigned a TASER until a few weeks before the events of this case. (JA 3259–60, 3276–77, 3290). Indeed, Matthews declined to take the TASER training class before January 2009 because he did not want to be tased. *Id.* Prior to April 27, 2009, Matthews never used his pepper spray, his TASER, or his service weapon in the line of duty. (JA 3313, 3333).

Upon arriving at the scene, Matthews stopped his vehicle and observed, before exiting, two men standing in the grass beside a truck. (JA 3371–72). The two men were Thomas and Gross, (JA 3158–59), who were both dressed in white, sleeveless t-shirts. (JA 2319–20). According to Matthews, neither man appeared armed or injured, and neither posed an immediate threat. (JA 3388–89, 3391–92).

---

27, 2009 during which the LCSD were unable to make audio recordings. LCSD Dispatcher Carmen Collins ("Collins") undermined this claim, however, when she was deposed regarding her duties for the LCSD on April 27, 2009. Collins testified that all audio signals entering the LCSD dispatch office are recorded by computer. (JA 2189–92). Common sense dictates that if the audio transmissions were being received by the dispatch office, which they were, then the dispatchers had the ability to record the transmissions. Furthermore, there is evidence that the LCSD had the capacity to record audio transmissions on April 27, 2009, as two relevant 9-1-1 calls were recorded and have been produced by Defendants. (JA 2146 (noting that a recording of the Linda Schmidt 911 call has been delivered to the Court via CD); JA 2147 (noting that a recording of the Jimmy Martin 911 call has been delivered to the Court via CD)). A recorded telephone communication between the LCSD dispatcher and Central Carolina Hospital later in the day has also been produced by Defendants. (JA 2148 (noting that a recording of the call from LCSD to CCH has been delivered to the Court via CD)).    Therefore, Defendants' claim that the LCSD was unable to record the radio communications among the officers on the day in question happened is, at best, suspect.

It is undisputed that, at the time Matthews arrived at the scene, he knew only that a call had been made complaining of alleged property damage. (JA 3480). It is also undisputed that no property damage, or any other criminal offense, was occurring when Matthews arrived at the scene. *Id*.

**B.      Thomas and Gross Ask Officer Matthews for Help, and Matthews Responds by Tasing Thomas.**

When he arrived, Matthews parked approximately five to ten (5-10) feet behind the stopped truck (which belonged to Gross) and exited his patrol vehicle. (JA 3159). Thomas was unarmed and not verbally threatening anyone. (JA 2199–2209). Thomas thought that Matthews had been sent to help him. (JA 2856, 2860). Gross told Matthews that Thomas needed help, and Thomas stood with his hands in the air, limp, with his palms facing outward toward Matthews. (JA 2845–46, 3159). Thomas told Matthews, "I need some help," and Matthews and he walked toward each other. (JA 3160–61). Matthews then told Thomas to "[b]ack the fuck up," stepping toward Thomas and pushing him away. (JA 2854–58, 3161–62). It is undisputed that Matthews initiated the first physical contact against Thomas (the push), before Thomas made any physical contact with Matthews. (JA 2198–99).

After being pushed by Matthews, Thomas, unarmed with his hands held up and palms facing outward, once again moved toward Matthews, seeking help. Matthews pushed Thomas away a second time, saying, "Get the fuck away from me." (JA 2857–60). It is undisputed that Matthews initiated the second contact as

well. (JA 2201–02, 2855–60). At the time, Matthews did not believe he was in physical danger or that Thomas was moving toward him to hurt him. (JA 3391–92).

After pushing Thomas a second time, Matthews removed his newly-issued TASER from its holster, began yelling at Thomas to "[g]et on the ground," and aimed the TASER at Thomas's face and chest. (JA 2863–65, 3163–64). Thomas was frightened and attempted to follow Matthews's initial instructions to move back and away from him. (JA 2864–65). To that end, Thomas turned away from Matthews and began retreating toward the rear of Matthews's vehicle. (JA 2866–73, 3164–65). Without provocation, Matthews then shot Thomas **in the back** with his TASER. *Id.* The Information Sheet from Matthews's TASER indicates that Matthews first deployed his TASER at 2:19:23 p.m., shortly after he arrived at the scene. (JA 2149). At no point during this period of time did Matthews inform Thomas that he was under arrest.[2]

After Matthews deployed his TASER, Thomas fell to the pavement, landing on his back. (JA 2878). Matthews then frantically radioed that he had deployed his TASER. (JA 3413–14).[3] Matthews next tased Thomas two additional times—both

---

[2] Matthews admitted in his deposition that he did not tell Thomas that he was under arrest until after Thomas had been handcuffed and a spit bag had been placed on his head. (JA 2911, 3385, 3396–97).

[3] The other LCSD officers testified that Matthews was "screaming for help" with "a frantic scream" and that they could "hear stress or fear" in Matthews's voice.

within twenty (20) seconds of each other, and both occurring less than two (2) minutes after Matthews's initial tasing of Thomas. (JA 2149). Thomas, who remained on the ground during the second and third tasings, was afraid for his life, (JA 2879), and did nothing in the brief period between tasings other than roll over from his back to his hands and knees. (JA 2211). There is no evidence that Matthews did anything to try to restrain Thomas during this interval.[4]

At this point, Thomas was unable to understand what Matthews was saying to him, but he understood that Matthews wanted space and tried to follow Matthews's instructions to move away from him. (JA 2879–80). Thomas did not want to be tased a fourth time and twisted the TASER wires off the barbs to stop Matthews. (JA 2882, 2885). Thomas attempted to get up and move away from Matthews when Matthews sprayed him with pepper spray. (JA 2887–89). Thomas again tried to get away from Matthews, and ran into a field across the road. (JA 2890). Matthews and Gross gave chase. (JA 3180, 3182–84). Gross called to Thomas to come back and Thomas, unable to see due to the pepper spray, ran in the direction of his voice, thinking that Gross protect him. (JA 2893, 2896, 2900–01, 3186). Gross, believing that Matthews would not allow him to calm Thomas

---

(JA 3875). Defendants agree that Matthews's calls for help were "frantic." (Def. Brief at 16).

[4] Indeed, there is no evidence that Matthews did anything to restrain Thomas, other than tasing him and spraying him with pepper spray, until later in the altercation when Thomas was tackled by Gross.

down, tackled Thomas. (JA 2901, 3188, 3193). Gross then assisted Matthews in

placing a handcuff on Thomas's right arm. (JA 3189, 3193).

## C. Defendants Babb and Estes Use Deadly Force Against Thomas, Punching and Kneeing Him in the Face and Fracturing His Jaw.

Deputy Ken Gilstrap was the first of the other LCSD officers to arrive at the

scene. (JA 3194–95). When Gilstrap arrived, Thomas had been tased three (3)

times and was already on the ground, (JA 2323–25, 2340, 3928), and Gross and

Matthews were attempting to handcuff him. (JA 3193–94).[5] Gilstrap immediately

ran over to Thomas, pulled Gross away from Thomas, and started repeatedly tasing

Thomas while Thomas remained face down on the ground. (JA 2323–28, 3193–94,

3895).[6] Gilstrap admits he tased Thomas three times[7] and then jumped on

---

[5] Gilstrap testified that when he arrived at the scene, Gross and Matthews were not on top of Thomas, that Gross was "backing up" from Thomas at the time, and that Matthews had pulled out his service gun. (JA 3903–08). This testimony is inconsistent not only with the testimony of Thomas, Gross, and witness Richard Shearer, (JA 2326–27, 2911–12, 3192–95), but also with the Use of Force Reports that Matthews and Gilstrap prepared immediately after the incident. (JA 2151–56). The weight of the evidence suggests that Gilstrap offered false testimony during his deposition, making any facts derived from such deposition suspect.

[6] The LCSD officers ultimately tased Thomas seven more times—at 2:25:06 p.m., 2:25:23 p.m., 2:25:33 p.m., 2:26:21 p.m., 2:26:29 p.m., 2:27:30 p.m., and 2:27:51 p.m. (JA 2150). Central Carolina Hospital EMS records show that EMS was dispatched to the scene at 2:26 p.m. (JA 2157–59). As discussed *infra*, Defendants' records suggest that Thomas was tased multiple times after EMS was dispatched to the scene and the scene was secure. (JA 2218–19).

[7] To the extent Gilstrap testified that Thomas reached for Matthews's TASER, which was purportedly lying on the ground, after he first tased Thomas, such testimony should be disregarded. The testimony is not only self-serving, but

Thomas's back. (JA 2220–22).[8] Surprisingly, Gilstrap testified that he did not fear for his life during the struggle because both he and Matthews were on top of Thomas at the time. (JA 3965).

Detectives Clint Babb ("Babb") and Brian Estes ("Estes") arrived together shortly thereafter. Defendants' use of force expert testified that there is no evidence that, at that time, any of the officers were under an imminent threat of death or serious injury. (JA 2227). Nevertheless—in spite of the fact Thomas already had two LCSD officers on top of him—upon their arrival Babb immediately jumped out of his vehicle, ran over to Thomas, dropped to his knees, and punched Thomas in the face three or four times in rapid succession with a closed fist. (JA 2212–21, 2330–39, 3194–95, 3692–93, 3965, 3973). Babb punched Thomas in the face even though Thomas was face down on the ground, defenseless, not verbally threatening the officers, had at least two officers on his back, had not tried to punch, kick, or charge any of the officers, and had no weapon. (JA 2334–35). Babb struck Thomas downward from a kneeling position as Thomas's face was being held to the ground. (JA 2331–33). Indeed, Babb's assault was described by Richard Shearer, a

---

neither Gross, Thomas, nor R. Schearer testified that Thomas attempted to grab the TASER. *Compare* (JA 3444–3446, 3938) *with* (JA 2326–29, 2911–12, 3193–96).

[8] Although Gilstrap admits to tasing Thomas only three times, the evidence shows that Thomas was subjected to Gilstrap's TASER a total of seven (7) times in less than two and a half minutes, between 2:25:06 and 2:27:30. Detective Babb admits to tasing Thomas four times with Gilstrap's TASER.

third-party witness, as a "brutality," and witnessing it caused Mr. Shearer to become so upset that he left the scene. (JA 2332–33, 2336).

After Babb's punches, Estes approached Thomas and administered a series of knee strikes to Thomas's face. (JA 2226, 3202, 3206–07, 3210). Based on the medical evidence, this is likely when Thomas's jaw was broken. (JA 2167, 2316). As with Babb's punches, Estes's knee strikes took place while Thomas was defenseless on the ground, with officers on Thomas's back, and in spite of Thomas suffering the effects of pepper spray and multiple tasings. Plaintiff's use of force expert characterized both Babb's punches and Estes's knee strikes as "deadly force." (JA 2185–87).

While Babb and Estes were using deadly force against Thomas, Gross shouted at Babb to stop. (JA 3199–3202). After punching Thomas, Babb turned to Gross, yelling "Back the fuck up! Back the fuck up!" until another LCSD officer intervened and directed Gross across the road, out of sight of the remainder of the altercation. *Id.* However, Babb testified that he next picked up Gilstrap's TASER, cleared its cartridge, and then tased Thomas an additional four times. (JA 3772–73).

## D.     Thomas is Tased by LCSD Officers Multiple Times After Being Arrested, Handcuffed, and Subdued.

Most troubling is that, when viewed together, documents produced by Defendants—including documents from Central Carolina Emergency Medical

10

Services ("EMS"); the Information Sheets from the Defendants' TASERs; the LCSD's call reports; and the depositions of Matthews, Gilstrap, and Babb—indicate that LCSD officers tased Thomas multiple times **after** he had been fully handcuffed and subdued.[9] The LCSD's call reports state that Matthews called EMS at 2:23:34 p.m., (JA 2170–71), and Matthews testified that he did not do so until **after** Thomas had been fully handcuffed and subdued. (JA 3483–84). There should have been no need for Matthews or any other LCSD officer to use their TASER against Thomas after 2:23 p.m. (JA 3484). However, the Information Sheet from Gilstrap's TASER indicate that it was used against Thomas **three** times at 2:25 p.m., **twice** at 2:26,[10] and **twice** at 2:27 p.m.—all of which took place after Matthews called for EMS. (JA 2150).[11] Gilstrap admits to administering the first three tasings, and Babb admits to using Gilstrap's taser for the latter four. (JA 3772–73, 3826). Defendants deny that any tasings occurred after Thomas was in custody; therefore, there is a material factual dispute as to whether LCSD officers tased Thomas after he was fully handcuffed and in custody.

---

[9] Furthermore, after his arrest, Defendants continued to violate Thomas's constitutional rights by, *inter alia*, holding him for four days (4) and three (3) nights without access to his counsel or family and interrogating him without informing his of his *Miranda* rights. (J.A. 40-45, 54, 62, 66).

[10] There was also a test fire of the TASER by Babb prior to the final four tasings of Thomas.

[11] JA 2172 (demonstrative timeline of the tasings).

## SUMMARY OF THE ARGUMENT

At its core, this case involves a rookie police officer (Matthews) who unnecessarily panicked and deployed his newly issued TASER against Thomas, an unarmed man who was non-threatening, seeking assistance, and was attempting to comply with Matthews's commands when tased.  Due to his frantic radio communications during the encounter, Mathews set off an alarm that led some fifteen (15) LCSD personnel (including the Sheriff) to respond to the scene. Without properly assessing or understanding the situation, multiple law enforcement officers jumped on Thomas, who was face down on the ground, unarmed, and unable to protect himself, and employed excessive and deadly force against him in response to Thomas's minimal and futile resistance. In the span of eight minutes, Defendants tased Thomas ten times, sprayed his face with pepper spray, and punched and kneed him repeatedly in the head and face while other officers laid on top of him and forced his arms behind his back. Among the injuries sustained by Thomas as a result of Defendants' actions were a broken jaw which required surgery to be repaired and a missing tooth; Defendants, who were in no significant danger at any point during the altercation, suffered no injuries.

Shockingly, evidence produced by the Defendants in this case—including documents from EMS and the LCSD, Information Sheets from the Defendants' TASERs, and Mathews's deposition testimony—suggest that the LCSD officers

tased Thomas multiple times even **after** he had been secured and handcuffed. Other LCSD personnel who arrived at the scene and witnessed the brutal treatment of Thomas did nothing. Furthermore, after the assault on Thomas, Defendants held Thomas for four days and three nights without any access to his counsel or family.

Considered in the light most favorable to Thomas, the facts show that the Defendants violated Thomas's Fourth Amendment rights by using unreasonable, excessive force in his arrest. When Matthews arrived at the scene, Thomas had committed a mere misdemeanor, was unarmed, and approached Matthews in a non-threatening manner asking for help. In response, Matthews repeatedly shoved Thomas, yelled at Thomas to get on the ground, and then tased him in the back as Thomas attempted to comply with Matthews's instructions. Matthews then tased Thomas two more times while he lay helpless on the ground, and made no effort to place Thomas under arrest or read Thomas *Miranda* warnings. When Defendants Babb and Estes arrived on the scene, they used deadly force against Thomas, punching and kneeing him in the face and head even though Thomas was helpless, pinned to the ground by two other LCSD officers, and posed no threat to the officers. After Thomas was subdued and in custody, Defendants Gilstrap and Babb tased him an additional **seven times**. Other Defendants who arrived at the scene, including Sheriff Carter, witnessed these brutalities without intervention.

Defendants are not entitled to qualified immunity, public officer's immunity, or any other defense to their actions. At the very least, there are material factual disputes regarding Defendants' use of force sufficient to preclude summary judgment. Accordingly, this Court should affirm the District Court's denial of Defendants' motion for summary judgment.

## STANDARD OF REVIEW

Thomas agrees with Defendants that the proper standard of review for a denial of summary judgment is *de novo*. (Def. Brief 24). However, inherent in that review is that the appellate court "apply[] the same standard applied by the district court." *Standard Pacific of the Carolinas*, *LLC v. Amerisure Ins. Co.*, No. 11-1444, 2012 WL 6604614, at *2 (4th Cir. Dec. 19, 2012) (*per curiam*). Therefore, Defendants' motion for summary judgment is proper only if they "show[] that there is no genuine dispute as to any material fact and [they] are entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247 (1986). In the qualified immunity context, the burdens of both proof and persuasion rest with the Defendants. *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003).

When reviewing a motion for summary judgment, a court should believe the evidence of the non-movant (in this case, Plaintiff) and draw all justifiable inferences in that party's favor. *Boitnott v. Corning*, *Inc.*, 669 F.3d 172, 175 (4th

Cir. 2012). This evidentiary rule is particularly important when a motion for summary judgment is based on a defense, like qualified immunity, that relies upon a defendant's perception:

> Care is required in deciding whether the evidence presents a genuine issue of motive, for "summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of [a] claim or defense." Resolution of questions of intent often depends on "the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross-examination."

*Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985) (*overruled on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)) (citations omitted). It is for this reason that a district court in this circuit recently held that "[i]t is inappropriate for a court to grant summary judgment for an excessive force claim when there are disputes regarding the degree, or existence, of the alleged use of excessive force." *Howie v. Prince George's County*, *Maryland*, No. DKC 2006-3465, 2009 WL 2426018, at *4 (D. Md. Aug 5, 2009) (citing *Young v. Prince George's County*, *Maryland*, 355 F.3d 751 (4th Cir. 2004)).[12]

It is important to discuss the summary judgment standard at the outset because Defendants incorrectly characterizing the Court's inquiry in this case.

---

[12] It should be noted that Defendants make minimal effort in their brief to describe the facts of this matter in the light most favorable to Thomas. In addition, Defendants' brief routinely mischaracterizes the deposition testimony of the LCSD officers and others, as well as includes irrelevant information meant to disparage Thomas. *See*, *e.g.*, (Def. Brief at 21–22).

15

Defendants assert that "the Court's focus should be exclusively on the information known to, and the reasonable perceptions of, the officers," and that "the Court is not to focus on the 'actual facts' or conflicting versions of the "actual facts," but [instead] on what each deputy <u>reasonably perceived</u>." (Def. Brief 24). Defendant is advocating an entirely different standard of review, one in which an officer's testimony of his perceptions, no matter how self-serving, is considered sacrosanct, and any evidence to the contrary is disregarded. This Court has already rejected this type of standard for summary judgment motions in the qualified immunity context:

> [T]he qualified immunity question can be difficult for a court to resolve as a matter of law, as it can at times require "factual determinations respecting disputed elements of [a defendant's] conduct." The importance of summary judgment in qualified immunity cases "**does not mean . . . that summary judgment doctrine is to be skewed from its ordinary operation to give special substantive favor to the defense**, important as may be its early establishment."

*Wilson*, 337 F.3d at 397 (citations omitted) (emphasis added). The law's requirement that the Court believe Plaintiff's evidence and draw all justifiable inferences in his favor is particularly vital where, as here, there are genuine factual disputes as to the events that took place in the moments before Thomas was tased

16

by Deputy Matthews.[13] In short, a motion for summary judgment based on qualified immunity must be evaluated with the same standard as any other summary judgment motion, regardless of the Court's concurrent consideration of the reasonable perceptions of the Defendant officers.[14]

## **ARGUMENT**

**I.    DEFENDANTS MATTHEWS, BABB, ESTES, AND GILSTRAP ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON THOMAS'S CLAIMS UNDER 42 U.S.C. § 1983 BECAUSE THEY VIOLATED CLEARLY ESTABLISHED CONSTITUTIONAL LAW BY USING EXCESSIVE FORCE AGAINST THOMAS.**

Thomas alleges, *inter alia*, that four LCSD officers—Defendants Matthews, Babb, Estes, and Gilstrap—violated his Fourth Amendment rights by using excessive force and are, therefore, liable for damages under 42 U.S.C. § 1983.

---

[13] For example, Defendants claim that Plaintiff initially "corner[ed Matthews] as he stood between his open driver's door and the side of his patrol car," and later "made a sudden movement to his right" before being tased, (Def. Brief at 8–9); Plaintiff testified that he initially approached Matthews "with his hands in the air, limp, with his palms facing outward" and that he "turned away from Matthews and began retreating toward the rear of Matthews's vehicle" immediately before being tased. (JA 2845–46, 3159-61).

[14] None of the cases Defendants cite on this point support their position. In *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001), the Court considered a motion for judgment *non obstante veredicto*. *Greenidge v. Ruffin*, 927 F.2d 789, involved an evidentiary ruling under an "abuse of discretion" standard. Finally, the Court in *Mistead v. Kibler*, facing a similar legal question, held that "the objective facts 'must be **filtered** through the lens of the officer's perceptions' "and that such an approach "**limits** the need for decision-makers to sort through conflicting versions of the 'actual' facts." 243 F.3d 157, 163 (4th Cir. 2001) (emphasis added). That is significantly different from Defendants' characterization of the Court's inquiry, which disregards conflicting evidence altogether.

Specifically, Matthews used excessive force by initially and repeatedly deploying his TASER (and pepper spray) against Thomas, a non-threatening, unarmed man who approached Matthews seeking help. Defendants Babb and Estes used excessive force by employing deadly force, through multiple punches and knee strikes to Thomas's head and face, in an effort to place Thomas under arrest, even though he was defenseless, non-threatening, and being held on the ground. Furthermore, evidence produced by Defendants indicates that Defendants Babb and Gilstrap tased Thomas after he was handcuffed and subdued, which constitutes unconstitutionally excessive force.[15]

Defendants' argument that the officers used reasonable force and are entitled to qualified immunity is contrary to the facts. The trial court correctly found that there are significant factual disputes sufficient to preclude summary judgment regarding the Defendants' use of force against Thomas—including but not limited to when the force was used and the degree or existence of that force. The Fourth Amendment's prohibition against the use of excessive force to effect a "seizure" is well-established law; consequently, Defendants are not entitled to qualified immunity, making summary judgment on Thomas's § 1983 claims improper.

---

[15] Defendants deny that these tasings took place at the time indicated by the TASER data and reports. (Def. Brief at 42–45). For the purposes of summary judgment, this is a highly material fact that is in dispute.

## A.    Qualified Immunity Standard.

Qualified immunity only protects government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights." *In re Allen*, 106 F.3d 582 (4th Cir. 1997) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity balances "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably" with "the need to hold public officials accountable when they exercise power irresponsibly," *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To evaluate a defendant's claim of qualified immunity in a § 1983 action, courts apply a two-step inquiry. First, a court asks whether, viewing the facts in the light most favorable to the injured party, defendant's conduct violated the plaintiff's constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). After finding a constitutional violation, the second step is determining whether the violated right was clearly established at the time of defendant's action. *Id.*[16] The plaintiff bears the burden of proving a constitutional violation, and thereby shifts the burden to the defendant to prove that the violated right was not clearly established. *Henry v. Purnell*, 501 F.3d 374, 377 (4th Cir. 2007).

---

[16] The Supreme Court held in *Pearson* that the steps need not be considered in a particular order, 555 U.S. at 236–43, but many courts continue to adhere to the framework established in *Saucier*. *See*, *e.g.*, *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) ("[W]e exercise our discretion to use the two-step procedure of *Saucier*.").

**B.    Defendants Matthews, Babb, Estes, and Gilstrap Violated Thomas's Fourth Amendment Rights by Using Excessive Force Against Him.**

The seminal case on qualified immunity in the law enforcement context is *Graham v. Connor*, 490 U.S. 386 (1989). In that case, a North Carolina citizen sustained injuries during an investigatory stop by law enforcement. *Id.* at 390. He filed a § 1983 action against the officers involved in the stop, alleging that they used excessive force during the stop and arrest. *Id.* Upon review, the Supreme Court rejected the "notion that all excessive force claims brought under § 1983 are governed under a single generic standard," and held that the proper analysis was under the Fourth Amendment:

> Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures" of the person. . . . [Today we] hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment.

*Id.* at 394–95.

Having identified the constitutional right at issue, the Supreme Court held that, consistent with other claims under the Fourth Amendment, a § 1983 excessive force claim was properly analyzed using the amendment's "reasonableness" standard. *Id.* at 395. The "reasonableness" standard is used to determine "whether

20

the totality of the circumstances justifie[s]" the use of force in a particular case. *Clem v. Corbeau*, 284 F.3d 543, 550 (4th Cir. 2002). The significant circumstances identified by the Court in *Graham* "includ[e] the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8–9). In the Fourth Circuit, "[t]he extent of the plaintiff's injury is also a relevant consideration." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003).

Defendants' claim that "[a]nalysis of the *Graham* factors conclusively demonstrates that no excessive force was used" and that the actions of Defendants Matthews, Babb, Estes, and Gilstrap were "objectively reasonable." (Def. Brief 35). To the contrary, there are a number of material factual discrepancies regarding each of the *Graham* factors such that, viewing the facts in the light most favorable to Plaintiff, a jury could find that Defendants' use of force was in violation of Thomas's constitutional rights.

1.   Severity of the Crime: The Crimes for Which Thomas was
     Arrested are Misdemeanors That Carry Minor Penalties.

Under the first *Graham* factor, a court considers the **severity** of the crime—that is, whether the crime for which a § 1983 plaintiff was arrested is severe enough that the level of force used to effect that arrest is reasonable under the Fourth Amendment. *Graham*, 490 U.S. at 396. The Fourth Circuit has held that in

21

cases where no crime has been committed or where the "offense was a minor one," the first factor should weight in favor of the plaintiff. *Jones v. Buchanan*, 325 F.3d 520, 528 (4th Cir. 2003) (quoting *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994)). Defendants provide a list of Thomas's alleged criminal activities—including some for which he was not arrested—and claim without supporting evidence that such activities are not "minor offenses." (Def. Brief 29–31). Defendants' argument is not only mischaracterizes Fourth Circuit precedent, as explained below, but fails to analyze of the severity of Thomas's criminal violations.

Before being placed in custody, Thomas allegedly committed three misdemeanors: willful and wanton injury to real property, disorderly conduct, and resisting officers.[17] (JA 2174–76).[18] Thomas's first two misdemeanors were not witnessed by Matthews, and Thomas did not engage in any further criminal activity until after Matthews tased him. (JA 2321, 2911, 3480). In fact, the District Court noted that when Matthews "arrived at the scene . . . approaching at a normal rate of speed and without use of his sirens, Plaintiff and his friend were standing in

---

[17] To the extent that Defendants have referenced in their brief the disposition of Thomas's criminal proceedings, (Def. Brief at 22), such information is irrelevant, as the first *Graham* factor considers the severity of Thomas's crimes at the time force was used against him. There is no purpose for Defendants' mention of Thomas's criminal proceedings except to unfairly disparage him.

[18] Thomas was also charged with malicious conduct by a prisoner and assault on a police officer, but his conduct leading to these charges took place after he had been arrested, and after Defendants subjected him to multiple tasings and deadly force.

a grassy area and neither was armed." (JA 4582–83). Most importantly, the three crimes described above carry only minor penalties. Willful and wanton injury to real property is a Class 1 misdemeanor, § 14-147, and disorderly conduct and resisting officers are both Class 2 misdemeanors, §§ 14-223 and 14-288.4. It was unlikely that, if convicted, Defendant would have served any jail time. Even Defendants' expert admitted that the destruction of property at issue would not qualify as a severe crime under the *Graham* analysis. (JA 2195).

In their brief, Defendants skew the severity analysis, citing cases for the proposition that the Fourth Circuit "focuses on the existence of criminal activity rather than the extent of harm caused by that activity." (Def. Brief 30). Defendants attempt to recast the first *Graham* factor as a test of whether criminal activity existed, rather than an evaluation of the "severity" of the alleged criminal conduct. No Fourth Circuit Court of Appeals opinion adopts Defendants' interpretation of the first *Graham* factor, which is unsurprising given that Defendants' interpretation is both inconsistent with *Graham* and mischaracterizes Fourth Circuit precedent. The Court in *Wilson* still looked at the severity of the crime–in that case assault–in its analysis of the first *Graham* factor. 429 F.3d 465, 468 (4th Cir. 2005). There is no indication in *Wilson* that the Court intended to reduce the first *Graham* factor to a simple analysis of "crime versus no crime"; indeed, the Court quoted *Graham*

23

when it identified the first factor as "the **severity** of the crime at issue." (emphasis added).[19]

Henry v. Purnell is more analogous to this case. In *Henry*, the Fourth Circuit denied qualified immunity to an officer who shot a fleeing suspect while attempting to arrest him for not paying child support. 652 F.3d 524, 531–35 (4th Cir. 2011). In finding that the officer was not entitled to immunity, the court evaluated the severity of the crime by noting that "Henry had an eleven-day old warrant issued for a misdemeanor" and was not engaged in "menacing conduct." *Id.* at 532.[20] Like the suspect in *Henry*, Thomas was arrested for misdemeanors, which carried minor penalties and were unlikely to result in jail time; Defendants, however, subjected Thomas to serious and deadly force in their efforts to arrest him. The District Court correctly characterized the severity of Thomas's crimes as

---

[19] To the extent that Defendants cite *Drewry v. Stevenson*, No. WDQ-09-2340, 2011 WL 1298160 (D. Md. Mar. 31, 2011), and *McConnell v. Griffith*, No. 5:08CV113, 2010 WL 420051 (N.D. W.Va. Jan. 29, 2010), such opinions echo Defendants' flawed interpretation of *Wilson* and are in the minority. *See*, *e.g.*, *Goodman v. Barber*, No. 7:11-CV-00153-F, 2012 WL 4928873 (E.D.N.C. Oct. 16, 2012) ("[T]he court finds that the crime Goodman was charged with . . . was serious."); *Largie v. Gerres*, No. WDQ-11-2765, 2012 WL 1965450 (D. Md. May 30, 2012) ("The only crime to which [Largie] pled guilty was the relatively minor offense of failing to obey an order to stop his van."). The most recent Fourth Circuit opinion on point not only declines to adopt Defendants' interpretation of the first *Graham* factor, but specifically notes in its analysis that the plaintiff "was not suspected of committing a violent crime." *Smith v. Ray*, 409 Fed. Appx. 641, 649 (4th Cir. 2011).

[20] *Henry*, which postdates *Wilson*, also declines to adopt Defendants' interpretation of the first *Graham* factor.

"minor, [with] no other factors when Deputy Matthews arrived at the scene to suggest otherwise." (JA 4583). Thus, the first *Graham* factor weighs in favor of Thomas.

>       2.    Immediate Threat to the Safety of the Officers or Others: Thomas Posed Little Threat When Initially Tased by Defendant Matthews, No Threat when Subjected to Deadly Force by Defendants Babb and Estes, and Was Already In Custody When Tased by Defendants Gilstrap and Babb.

The second *Graham* factor considers "whether the suspect poses an immediate threat to the safety of the officers or others," from the perspective of the officer at issue. 490 U.S. at 396; *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991). The facts, viewed in the light most favorable to Thomas, show that Thomas did not at any time pose an immediate threat to the safety of Defendants sufficient to justify the numerous tasings and deadly force used against him. Because the *Graham* analysis gives special consideration to the perspective of the individual officers, each officer's use of force against Thomas is considered.

When Defendant Matthews arrived on the scene, Thomas was not engaged in any purported criminal activity. Thomas and Gross were calmly waiting at the back of Gross's truck for Matthews to arrive. (JA 2321, 2911, 3153–56, 3480). After Matthews exited his patrol vehicle, Thomas approached him in a non-threatening manner, standing with his arms in the air, palms raised, asking Matthews for help. (JA 2856, 2860, 3159–61). Defendants' expert testified that

Thomas was never armed, never picked up anything off the ground, never threw anything, and never threatened bodily harm against Matthews or any other officer. (JA 2199–2209).

Rather than help Thomas, Matthews panicked, and became the aggressor by shoving Thomas twice and telling him to "back the fuck up." (JA 2854–58, 3161–62). When Thomas approached Matthews a second time, again seeking help, Matthews drew his TASER, and began yelling at Thomas to get on the ground. (JA 2863–65, 3163–64). Thomas began to back up and turn around in an attempt to comply with Matthews's commands, when Matthews shot Thomas in the back with his TASER from a distance of approximately six to eight feet. (JA 2866–73, 3164–65). Matthews testified that he did not believe he was in danger when he initiated the confrontation. (JA 3391–92). The evidence, in the light most favorable to Thomas, shows that he posed little, if any, threat to Matthews when Matthews tased him, and was in fact attempting to comply with Matthews's instructions.

Furthermore, Thomas posed no threat whatsoever when Defendants Babb and Estes used deadly force against him. At the time Babb and Estes arrived to assist in Thomas's arrest, Thomas was on the ground in a prone position, with at least one arm in handcuffs and both Defendants Matthews and Gilstrap on Thomas's back. (JA 2220–22). At the time, Thomas had been stunned by multiple tasings and sprayed with pepper spray, yet had not tried to attack or harm any of

the law enforcement officers on the scene. (JA 2334–35). Gilstrap testified that he was never in any fear for his life during his encounter with Thomas, (JA 3965), and Defendants' expert testified that none of the officers were under an imminent threat of death or serious injury. (JA 2227). Nevertheless, Babb immediately ran over to Thomas, dropped to his knees, and punched Thomas three or four times in the face with a closed fist. (JA 2330–39; 3374–75, 3693, 3970, 3973).[21] A disinterested witness described Babb's punches as a "brutality," (JA 2336), and Plaintiff's expert characterized them as deadly force. (JA 2185–87).

While Thomas remained on the ground and unable to defend his head or face, Defendant Estes then kneed the side of Thomas's head multiple times. (JA 2226, 3382, 3386–87). Plaintiff's expert characterized Estes's knee strikes as deadly force, (JA 2185), and the medical evidence suggests that Estes struck with such force as to fracture Thomas's jaw. (JA 2167, 2316). Thomas was admittedly struggling (but not fighting) with Defendants, but he posed no immediate threat to their safety, nor did his level of resistance justify the use of deadly force against him.

Finally, Plaintiff was certainly not a threat to any of the Defendant officers after he had been arrested and secured in handcuffs. The LCSD's call reports state

---

[21] That Babb dropped to his knees is significant. Because Thomas was lying on the ground with Matthews and Gilstrap on his back, Babb's kneeling position afforded him better leverage to punch a defenseless Thomas with more force.

27

that Matthews called EMS at 2:23:34 p.m., and Matthews testified that he did not make the call until Thomas was arrested and subdued. (JA 3483–84). However, data from Gilstrap's TASER indicates that it was used against Thomas **seven times** between 2:25 p.m. and 2:27 p.m.—all after Thomas had already been placed in handcuffs. (JA 2150). Gilstrap and Babb admit to using Gilstrap's TASER to administer the seven tasings in question against Thomas. (JA 3772–73, 3826). Therefore, Defendants' own evidence and testimony show that Thomas was tased while he was under arrest and offering no resistance.

Defendants argue that Thomas "posed an immediate threat" to them through a series of purportedly "undisputed" facts that were not contradicted by the District Court. (Def. Brief 31–32). Each of these facts has not only been directly contradicted by Thomas—indeed, in this very brief—but the District Court correctly viewed the facts in the light most favorable to Thomas when determining that Defendants used excessive force against him. Defendants' first "undisputed" fact is "that Thomas immediately confronted Matthews, coming within arms' reach of Matthews such that Thomas could assault Matthews without warning and/or attempt to disarm Matthews." (Def. Brief 31). However, Thomas and Gross contradicted this when they testified that Thomas stood with his hands in the air, palms outward, and asked for help as he walked toward Matthews, (JA 2845–46, 3159), and the District Court properly found that Thomas "approached Defendant

28

Matthews . . . with his hands outstretched asking for help." (JA 4579). Defendants' second and third "undisputed" facts are "that Thomas refused to step back from Matthews despite repeated commands to do so," and "that after Matthews had drawn his Taser, Thomas refused to comply with Matthews' instructions to get down on the ground." (Def. Brief 31). Again, Thomas testified that he had turned away from Matthews and was retreating toward the rear of Matthews's vehicle before being tased—behavior that the District Court characterized as "an attempt to comply with Defendant Matthews' instructions." (JA 4583). Indeed, it is undisputed that Thomas was first tased **in his back**—which is consistent with Thomas's testimony that he had turned his back and was moving away from Matthews in an attempt to comply with his commands, and inconsistent with Defendants' position that Thomas refused to comply with Matthews's orders. Finally, Defendants claim it to be "undisputed" that Matthews continued to tase Thomas "in response to Thomas' repeated failure to obey his commands to stay on the ground." (Def. Brief 32). In reality, Thomas testified that he did nothing after being tased other than roll from his back to his hands and knees, (JA 2211), and there is no evidence that Matthews made any attempt to restrain Thomas during this interval. Indeed, the District Court cited Matthews's own testimony when it found Thomas "was on the ground . . . begg[ing] not to be tased again." (JA 4583).

29

To the extent that Defendants insist that there are factual disputes on these issues, such disputes counsel **against** summary judgment.

Defendants do not contend that Thomas posed an immediate threat to the safety of anyone when Babb and Estes used deadly force against him or when Gilstrap and Babb tased him. The only "immediate threat" Defendants contend that Thomas posed was invading Defendant Matthews's space while Thomas begged for help. In response, Matthews tased Thomas while he was attempting to comply with Matthews's commands, and Defendants Babb and Estes employed deadly fist and knee strikes to Thomas's head and face while he lay prone on the ground, defenseless and surrounded by law enforcement officers. Gilstrap and Babb admit to further tasing Thomas, Defendants' evidence shows that this tasing took place after Thomas was subdued and arrested. The level of force Defendants used in this case was unreasonable, and therefore the second *Graham* factor weighs in favor of Thomas.

    3.    <u>Resisting or Evading Arrest: Thomas was Not Under "Arrest" When Initially Tased by Defendant Matthews, and Offered Only Minimal Resistance Before He was Subjected to Deadly Force by Defendants Babb and Estes.</u>

The final factor articulated by the Supreme Court in *Graham* considers whether a plaintiff alleging excessive force was resisting or attempting to evade arrest when the disputed force was used. Defendants' treatment of this factor focuses on the sheer amount of force applied against Thomas. Defendants argue

that because "Plaintiff remained uncontrollable, unsecured and unwilling to comply with the deputies' attempts to secure him," the amount of force used against him was reasonable. (Def. Brief 35). Defendants' reasoning fails because it could justify the use of **any** amount of force against a resisting suspect. More importantly, it ignores the nature of the *Graham* analysis, which is a balancing test determining whether a **particular** use of force is justified given the **particular** circumstances under which it was used. *See* 490 U.S. at 396 (balancing "the nature and quality of the [Fourth Amendment] intrusion . . . against the countervailing governmental interests at stake").

As an initial matter, it is difficult to determine when the "arrest" that Thomas was resisting or evading began. It is undisputed that, from Thomas's first interaction with Defendant Matthews until the moment Matthews deployed his TASER, Matthews did not give Thomas any indication that he was under arrest. Thomas never thought he was being placed under arrest, even after Matthews pushed him, and Matthews admits he did not tell Thomas that he was under arrest or advise Thomas of his *Miranda* rights prior to tasing and pepper spraying him. (JA 2911, 3337–38, 3385, 3396–97). Matthews's purpose in commanding Thomas to get on the ground was not to place him under arrest, because "at that point, Thomas had done nothing wrong other than encroached on Deputy Matthews' immediate [proximity]." (JA 2183–84). Finally, after initially tasing Thomas and

31

knocking him to the ground, Matthews made no attempt to arrest, restrain, or subdue Thomas before tasing him two more times. Thomas simply was not resisting or evading arrest when Matthews tased him.

When Defendants Babb and Estes punched and kneed him repeatedly in the head, Thomas was struggling to protect himself, but this fact alone does not make the Defendants' use of force reasonable. *Graham*'s reasonableness test is a balancing test; thus it is important to assess the **extent** of Thomas's resistance to determine whether, at that moment, the use of deadly force was necessary to place him under arrest. 490 U.S. at 396. Defendants' expert classified Thomas's resistance at the time Babb and Estes used deadly force against him as "active" rather than "assaultive," explaining that although Thomas refused to comply with the officers' instructions or put his hands behind his back, he never possessed a weapon or threatened bodily harm against any of the officers. (JA 2199–210, 2223–25). Importantly, Thomas's attempts at resistance were futile, as he was prone, suffering the effects of multiple tasings and pepper spray, and held down by several LCSD officers.

It is true that Thomas struggled to evade the Defendants during the events in question; Thomas's struggles do not, however, give Defendants *carte blanche* to apply unlimited force against him. As with the other *Graham* factors, the level of force must be balanced against the need for such force; here, as the District Court

correctly found, Thomas "was not trying to fight the deputies," and "any minimal resistance by [Thomas] in the face of continued force by the deputies does not cause this third *Graham* factor to weigh in favor of Defendants." (JA 4584).

4.  The Extent of the Plaintiff's Injuries: Thomas's Injuries, Which Included a Broken Jaw and Required Surgery, Were Unnecessary Given His Minor Criminal Violations, the Lack of a Threat He Posed to Defendants, and the Minimal Nature of His Resistance.

The three *Graham* factors addressed thus far, while discussed in nearly every § 1983 excessive force case, are not exhaustive. The Supreme Court listed the factors as examples of those describing "the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. The Fourth Circuit identified an additional factor, "[t]he extent of the plaintiff's injury . . . [as] a relevant consideration." *Jones*, 325 F.3d at 537. In *Jones*, a citizen voluntarily went to a police station for help in regaining sobriety and suffered a broken nose and lacerated face after being attacked by the officers holding him. *Id.* at 530. The court found that "the severity of Jones's injuries provides still another ground for distinguishing this case from those in which we and other courts have held that a plaintiff has not established an excessive force claim." *Id.* at 531.

Thomas's injuries required immediate hospitalization and surgery. As a result of the excessive force used by Defendants, Thomas suffered a broken jaw and dental trauma; a lost tooth; blunt force trauma; various cuts, abrasions, and

bruises on his face and body; TASER wounds and scars; an injured wrist; and loss of consciousness. (JA 2229–31, 2311–15, 2317, 2963, 2966, 2972–73, 3024). Not only are these serious injuries far beyond those necessary for four law enforcement officers to subdue even a resisting suspect, but they serve as further evidence of the excessive force Defendants used to arrest an alleged misdemeanant. *See Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994) (affirming denial of summary judgment when officer tore anterior cruciate ligament of misdemeanant), *Kane v. Hargis*, 987 F.2d 1005 (4th Cir. 1993) (same when officer cut and bruised plaintiff's face and cracked three of his teeth). The District Court found that "this level of injury is not consistent with cases in which other courts have found that no excessive force was used." (JA 4584). This shows that this final factor should weigh in favor of Thomas.

### C. Thomas's Expert Only Offered Testimony Regarding the Reasonableness of Defendants' Actions under Defendants' Version of the Facts—Not with the Facts Viewed in the Light Most Favorable to Thomas.

Defendants spend two pages attempting to characterize the deposition testimony of Dave Cloutier, Thomas's use of force expert, as confirming that Defendants "each acted as a reasonable, trained officer would under the circumstances they encountered." (Def. Brief 35–38). It is true that, during his testimony, Cloutier opined that, in certain specific circumstances, the actions taken by the Defendant officers could be considered reasonable. But in each of these

cases, Cloutier was responding to hypotheticals posed by Defendants' counsel which contained a severely biased version of the facts—hypotheticals that do not comport with the facts considered by the Court here. Cloutier was never asked his opinion of Defendants' actions under the facts viewed in the light most favorable to Thomas; as such, his deposition testimony is not dispositive in this matter.

Defendants rely on Cloutier's testimony for a number of assertions, none of which survive scrutiny. First, Defendants claim "that it is reasonable for an officer to use his Taser in a 'preemptive strike' if the officer perceives an imminent threat, which Cloutier acknowledges was a reasonable perception on Matthews' part." (Def. Brief 36). The relevant deposition testimony is as follows:

> Q.  And **if an officer was assaulted in the manner that Deputy Matthews has testified**, that he was assaulted by Mr. Thomas, would there be anything unreasonable about using—using your taser in this situation to try to protect yourself or gain control over the subject?
> A.  **If it in fact occurred as Deputy Matthews indicated**, there would be absolutely no—no reason not to use a taser.
> . . .
> Q.  But would it also be appropriate if an—that an officer could be justified in—in using a taser against a subject that **refuses to obey his instructions** and continues to get into his personal reactionary zone despite being told to get back?
> A.  Again, **if the officer perceives the imminent threat**, then I guess for lack of better terminology, a preemptive strike could be deemed reasonable based on the circumstances.

(JA 865–68) (emphasis added). Cloutier's answer to the first question was in response to a hypothetical, based on Defendant Matthews's testimony, in which

Thomas "dropped his shoulder and rushed into [Matthews] and drove him against his patrol car," (JA 863); this version is directly contradicted by Thomas's testimony. Cloutier's answer to the second question relies on the assumption that Thomas refused to obey Matthews's orders and that Matthews perceived an imminent threat; the facts viewed in the light most favorable to Thomas are that Thomas was attempting to comply with Matthews's instructions when Matthews tased him in the back, and Thomas posed little threat to Matthews's safety at the time. Cloutier offered no opinion regarding Matthews's actions under the circumstances this Court must consider. In fact, Cloutier concluded in his expert report, after reviewing the evidence in this matter, that "the actions of defendant officers . . . were reckless, unreasonable, and excessive considering the totality of the circumstances."

Next, Defendants claim that Cloutier "opine[d] that all three of Gilstrap's applications [of his TASER] were objectively reasonable **under the circumstances described by Gilstrap**." (Def. Brief 36) (emphasis added). These circumstances, based entirely on Gilstrap's testimony, where that Thomas "was going to charge him," that he saw Thomas "reaching for Deputy Matthews' taser that was lying on the ground," and that Thomas's efforts to get up on his knees while struggling with LCSD officers were an "imminent threat." (JA 909–12). These circumstances are all disputed by the testimony of Thomas and others; in

36

fact, Gilstrap himself testified that he was not in fear for his life during the struggle with Thomas because both he and Matthews were on top of Thomas at the time. (JA 3965). Again, the testimony of Cloutier is not dispositive because it was given in response to a hypothetical posed by Defendants' counsel that does not describe the facts as viewed in the light most favorable to Thomas.

Finally, Defendants claim that "Cloutier confirm[ed] that it is not unreasonable for an officer to place his knee on a struggling subject's head and apply weight in an effort to keep him on the ground, as Estes did in this case." (Def. Brief 37). While this might not be the most important fact in this matter, it must be pointed out that Defendants' characterization of Cloutier's testimony on this point is utterly false. Cloutier never testified as to whether or not Babb putting a knee on Thomas's head was **reasonable**, as would be relevant for the purposes of *Graham*'s excessive force analysis; rather, he testified as to whether or not it was **appropriate**. In fact, Cloutier didn't even testify that Babb's actions **were** appropriate—only that they "would not necessary be inappropriate . . . so long as the proper amount of pressure . . . were applied." (JA 937–38). Cloutier's testimony on this topic has no dispositive weight on this Court's *Graham* analysis.

**D.     Thomas's Right to Be Free From Excessive Force During Seizure Was Clearly Established at the Time of the Altercation, and Defendants had "Fair Warning" That Their Use of Force Was Unconstitutional.**

Having established that Defendants' actions violated Thomas's Fourth Amendment rights, the second step of *Saucier*'s qualified immunity inquiry is to "ask whether the right was clearly established." 533 U.S. at 201. Rather than heed *Saucier*'s commands, Defendants rely on an out-of-circuit citation from *Board v. Farhham*, 394 F.3d 469, 477 (7th Cir. 2005), arguing that the proper question is whether, "under the specific facts of this case[, the Defendants'] actions were unconstitutional." (Def. Brief 38).[22] Defendants then cite cases in which Courts of Appeals have granted qualified immunity to law enforcement officers who used physical strikes, police batons, tasers, and other types of force to arrest suspects. (Def. Brief 38–42). Defendants' cases are easily distinguished from this one, but such an argument ignores the larger fallacy of Defendants' approach—the second step of the *Saucier* framework focuses on **Thomas's rights, not the Defendants' actions**. The Supreme Court's opinion in *Hope v. Pelzer* explains the appropriate inquiry:

---

[22] In their brief before the District Court, Defendants characterized the relevant inquiry as whether it was "clearly forbidden for law enforcement officers to use force similar to that used by the defendants under the circumstances of this case." (JA 712).

38

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. . . . [T]he salient question that the Court of Appeals ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of Hope was unconstitutional.

536 U.S. 730, 739, 741 (2002). Incidentally, the Court in *Hope* rejected a test similar to the one Defendants put forth—"that the facts of previous cases be 'materially similar' to [the plaintiff's] situation." *Id.* at 739. As the District Court correctly pointed out, "[q]ualified immunity does not . . . fail to protect actions only if the very actions have been previously held unlawful," (JA 4585), meaning that the law considers the circumstances of each use of force and does not create general categories of "constitutional" and "unconstitutional" force. The proper analysis is to examine the state of Thomas's Fourth Amendment rights on April 27, 2009.

As a starting point, Thomas's Fourth Amendment right to be free from "unreasonable searches and seizures" has been codified in the Constitution for nearly 250 years. U.S. Const. amend. IV. This Court acknowledged a prohibition on "unreasonable and excessive force in making an arrest" as early as 1985, four years before the Supreme Court began applying the *Graham* test. *Vizbaras v. Prieber*, 761 F.2d 1013, 1016 (4th Cir. 1985). Thus, Defendants had "fair warning"

39

that the use of "unreasonable and excessive" force to arrest Thomas would violate his Fourth Amendment rights.

Defendants, however, insist on a more exacting inquiry, arguing that, for Thomas's rights to have been clearly established, Defendants needed to have known that the specific **type** of force they used was constitutionally prohibited. It is worth noting that a Fourth Circuit judge has already warned against such a narrow examination. In his dissent in *Vizbaras*, Chief Judge Winter criticized the majority for "reason[ing] that because neither we nor the Supreme Court has specified the exact quantum of force that constitutes excessive force, the law was not 'clearly established[.]' . . . Yet many, perhaps most, constitutional deprivations involve questions of degree where the precise contours of the constitutional protections have not been drawn." 761 F.2d at 1018 n.3 (Winter, C.J., dissenting). This is why the Supreme Court in *Hope* settled on a "fair warning" standard seventeen years later.

In any event, the type of force Defendants used in this case has previously been found unreasonable, and therefore undeserving of qualified immunity. In *Rowland v. Perry*, a police officer observed a man stealing a five-dollar bill that was dropped at a bus station. 41 F.3d at 171. After following the man and believing that he was running away, the officer initiated a scuffle, during which he threw his weight against the man's leg, injuring the man's knee. *Id.* at 172. This

40

Court affirmed the district court's denial of qualified immunity, reasoning that, even though the man resisted arrest, his offense was "minor" and he "posed no threat to the officer or anyone else." *Id.* at 174.

Likewise in *Kane v. Hargis*, the plaintiff alleged that a police officer, after determining that the plaintiff was driving under the influence, "pinn[ed] her . . . to the ground and repeatedly push[ed] her face into the pavement, cracking three of her teeth, cutting her nose, and bruising her face." 987 F.2d at 1006–07. Applying *Graham*, this Court denied immunity, finding that "[i]t would have been 'apparent' to a reasonable officer in Hargis's position that, **after he had pinned [her] to the ground . . . and the woman did not pose a threat to him**, it was unreasonable to push her face into the pavement with such force that her teeth cracked." *Id.* at 1008 (emphasis added).

Another closely analogous case is *Franklin v. Montgomery County, Maryland*, No. DKC 2005-0489, 2006 WL 2632298 (D.Md. Sept. 13, 2006). In *Franklin*, a police officer stopped to question a group of young people loitering on a sidewalk and, after examining the group members' driver's licenses and running checks on some, returned all the licenses except Franklin's. *Id.* at *2. Franklin repeatedly asked for his license back, and a second officer, believing that Franklin's behavior was threatening, tackled him from behind. *Id.* at *2–3. The officers ordered Franklin to put his hands behind his back, and when he could not

comply with those instructions due to the officer on top of him, he was tased. *Id.* at *3. The district court denied defendants' summary judgment motion on Franklin's excessive force claim, finding that the reasonableness of the tasing hinged on whether Franklin **was attempting to comply with the officers' orders**. *Id.* at *13. Because Franklin testified that he was attempting to comply but was physically unable to, the court found an issue of material fact regarding whether the tasing was reasonable. *Id.* The court's holding was confirmed three years later in *Gray v. Torres*, which cited *Franklin* for the preposition that "a person who is attempting to comply with a police officer's commands . . . suffers excessive force if he is tased." No. WDQ-08-1380, 2009 WL 2169044, at *4 (D. Md. July 17, 2009) (denying summary judgment based on qualified immunity when plaintiff was not acting in an aggressive manner and was attempting to comply with an officer's instructions when tased). Thus, Matthews's specific actions—namely, tasing a person who was attempting to comply with his commands—was deemed unreasonable by a District Court in the Fourth Circuit nearly three years before the altercation at issue.

Here, Thomas approached Defendant Matthews with his hands raised in a non-threatening manner, and attempted to comply with Matthews by retreating and turning around. *Franklin* established nearly three (3) years before this case that Matthews's tasing of Thomas under those circumstances constitutes excessive

force. Later, Defendants Babb and Estes employed deadly force against Thomas while he was prone, unarmed, and being held down by other LCSD officers. Fourth Circuit coupled with the well-established constitutional prohibition of unreasonable force gave Defendants "fair warning" that the amount of force used to arrest Thomas violated his constitutional rights.[23]

The Fourth Circuit cases cited by Defendants are inapposite since they involve either a more serious offense or more threatening behavior than that involved here. For example, the plaintiff in *Caricofe v. Mayor and & City Council of Ocean City*, *Maryland* broke free from officers attempting to arrest him and stood up, "swinging his arms violently" and pinned one of the officers against a wall **before** force was used. 32 Fed. Appx. 62, 64 (4th Cir. 2002). In *Wilson v. Flynn*, the suspect committed domestic assault in the presence of a police officer and attempted to enter his house, where officers knew he kept a gun, after law enforcement attempted to arrest him. 429 F.3d at 466–67. Defendants' out-of-circuit citations are similarly distinguished.[24] This case-by-case analysis is not

---

[23] This is to say almost nothing against the use of deadly force to seize an unarmed suspect, which the Supreme Court specifically held to be unconstitutional in *Tennessee v. Garner*. *See* 471 U.S. at 11–12.

[24] In *Feldman v. Community College of Allegheny*, the suspect was actively engaged in a trespass at the time of his arrest, and the officers who arrested him merely "'wrestled' him to the ground." 85 Fed. Appx. 821, 826 (3rd Cir. 2004). A plaintiff in *Duran v. Sirgedas* "resist[ed] arrest by, among other things, biting an officer." 240 Fed. Appx. 104, 118 (7th Cir. 2007). The suspect in *Nail v. Gutierrez* was told that he was under arrest and lunged toward two officers before being

meant to suggest that *Rowland*, *Kane*, and *Franklin* do not also include factual singularities; it is meant to show that such microscopic analysis is both unsatisfying and outside the bounds of the inquiry established by *Saucier* and *Hope*. More importantly, it shows that there is at least a significant enough dispute regarding the extent of Thomas's rights on April 27, 2009 as to defeat summary judgment.

### E.     Defendants Gilstrap and Babb Also Violated Thomas's Constitutional Rights by Tasing Him After He Had Been Handcuffed, Taken into Custody, and Subdued.

In addition to finding that Defendants were not entitled to qualified immunity on Thomas's 42 U.S.C. § 1983 excessive force claims, the District Court also found that Thomas had "also proffered some evidence that Defendants deployed a taser on him *after* he was handcuffed," adding that there was "little question that the deputies in April 2009 had fair notice that deploying a taser against a handcuffed and subdued suspect would violate clearly established law." (JA 4587). The evidence was provided by Defendants themselves. Defendant Matthews testified that after the other LCSD officers and he had handcuffed and subdued Thomas, he called EMS to remove the TASER prongs from Thomas's

---

subjected to non-lethal force. No. 1:06-CV-292 PS, 2008 WL 4545332, at *2 (N.D. Ind. Oct. 10, 2008). Finally, the suspect in *Williams v. Sandel* posed a safety risk to both the officers arresting him and the public because he was jogging naked near midnight along a highway. 433 Fed. Appx. 353, 354 (6th Cir. 2011). None of these unique facts appear in this case.

back and tend to his various injuries. (JA 3483–84). The LCSD's call reports, which were created, maintained, and produced by Defendants, state that the call took place at 2:23:34 p.m. on April 27, 2009. However, the data obtained from Defendant Gilstrap's TASER—which, again, was created, maintained, and produced by Defendants—indicate that the TASER was deployed **seven times** between 2:25 p.m. and 2:27 p.m. (JA 2150). Gilstrap and Babb admitted to tasing Thomas seven times, (JA 3772–73, 3826), and the reports produced by Defendants indicate that these tasings occurred after Matthews had called EMS, and therefore after Thomas was in handcuffs and subdued.[25]

Defendants attempt to dispute this timeline by referring to conflicting testimony from other witnesses. (Def. Brief 42–45). Rather than successfully defeating Thomas's allegations that he was tased by Defendants Gilstrap and Babb after he was handcuffed and subdued, Defendants arguments only illuminate the extent to which there are disputes of material fact. Fourth Circuit precedent states that qualified immunity does not lie when force is used after a suspect is secured, *Jones v. Buchanan*, 325 F.3d 520, 533–34 (4th Cir. 2003) (and listing other cases

---

[25] To the extent that Babb and Gilstrap repeatedly tased Thomas after he was arrested, a claim of excessive force against a pretrial detainee is governed by the Due Process Clause of the Fourteenth Amendment. *See Wilkins v. Gaddy*, – U.S. –, 130 S. Ct. 1175, 1178, (2010) ("The core judicial inquiry . . . is whether force was applied in a good-faith effort to [arrest] or maliciously and sadistically to cause harm."). There is at least an issue of material fact as to whether the Defendants' post-custody tasings were in good faith or necessary for discipline.

with the same holding); therefore, the clear factual disputes regarding the timing of Gilstrap's and Babb's tasings against Thomas make summary judgment inappropriate on this point, as the District Court correctly held.

******

At their core, *Graham* and *Clem* require courts evaluating an excessive force claim under § 1983 to examine the totality of the circumstances, determining whether a law enforcement officer's use of force was reasonable in a given situation. Here, Defendant Matthews, a young, inexperienced sheriff's deputy, responded to a complaint that Thomas was damaging a decorative fence. When Matthews arrived, Thomas was not engaged in any criminal activity and approached Matthews unarmed and with his hands raised in a non-threatening manner, asking for help. Rather than assisting Thomas, Matthews panicked, aggressively shoving and cursing at Thomas and then tasing Thomas as he attempted to comply with Matthews's commands. When Defendants Babb and Estes arrived at the scene, Thomas lay prone on the ground with two LCSD officers on his back. Even though Thomas posed no threat to the officers, Babb punched Thomas in the face and head multiple times. Estes followed suit with a series of knee strikes to Thomas's head and face. As a result, Thomas sustained a broken jaw, dental and blunt force trauma, serious cuts and bruises, and extensive TASER wounds. Furthermore, there is an issue of material fact as to whether Babb and Gilstrap tased Thomas while he was in custody, based on Defendants' own

46

documents and testimony suggesting that Thomas was tased seven times by Gilstrap and Babb after Matthews called EMS.

In the light most favorable to Plaintiff, the evidence shows that Defendants came upon a helpless and non-threatening alleged misdemeanant and used excessive force to arrest him. Defendants' actions were excessive, unreasonable, and in violation of Thomas's Fourth Amendment rights. For those reasons, Defendants are not entitled to summary judgment.

## II. DEFENDANTS CARTER, MARCUM, SMITH, ALLEN, MELTON, AND LLOYD ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON THOMAS'S BYSTANDER LIABILITY CLAIMS BECAUSE THERE ARE ISSUES OF MATERIAL FACT REGARDING WHETHER THEY KNEW THOMAS'S CONSTITUTIONAL RIGHTS WERE BEING VIOLATED, HAD A REASONABLE OPPORTUNITY TO PREVENT THE HARM, AND CHOSE NOT TO ACT.

Thomas also asserted bystander liability claims against individual Defendants Carter, Melton, Smith, Marcum, Allen, and Lloyd under § 1983 for their failure to intervene during the unconstitutional arrest of Plaintiff. A police officer's failure to intervene on behalf of a person whose constitutional rights are being violated in his presence by other officers can give rise to § 1983 liability. *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 129 (2d Cir. 1997) ("A police officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers. Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability."

(internal citations and quotation marks omitted)); *see also Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 203 (4th Cir.2002).

An officer may be liable on a theory of bystander liability if he or she "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Id*. at 204. Defendants Marcum, Allen, and Melton contend that they are entitled to summary judgment on Thomas's bystander liability claims because they had neither knowledge of the constitutional violations nor a reasonable opportunity to prevent the harm. (Def. Brief 47–48). Defendants Carter, Smith, and Lloyd contend that they are entitled to summary judgment on Thomas's bystander liability claims because they did not have a reasonable opportunity to prevent the harm. (Def. Brief. at 46–49). However, Defendants' arguments are based solely on their self-serving testimony, and contradict documents and information produced by Defendants suggesting that Thomas was tased after he was handcuffed. *See infra* § I.E. With respect to every Defendant except Melton, there is at least an issue of material fact as to whether each present when Thomas was tased while he was already restrained in handcuffs. Accordingly, there is an issue of material fact with respect to whether the Defendants knew that Thomas's constitutional rights were being violated and had a reasonable opportunity to prevent the harm. As such,

the District Court's denial of Defendants' motion for summary judgment on Thomas's bystander liability claims was proper and should be affirmed.

### III. DEFENDANTS MATTHEWS, BABB, GILSTRAP, AND ESTES ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON THOMAS'S INTENTIONAL TORT CLAIMS BECAUSE THEIR USE OF EXCESSIVE AND UNREASONABLE FORCE AGAINST THOMAS CONSTITUTES ASSAULT AND BATTERY UNDER NORTH CAROLINA LAW.

In addition to his excessive force claims 42 U.S.C. § 1983, Thomas also alleged that the actions of Defendants Matthews, Babb, Gilstrap, and Estes, in their individual capacities, constituted assault and battery under North Carolina law. "[A] civil action for damages for assault and battery is available at common law against one who, for the accomplishment of a legitimate purpose, such as justifiable arrest, uses force which is excessive under the given circumstances." *Myrick v. Cooley*, 91 N.C. App. 209, 215, 371 S.E.2d 492, 496 (1988). Plaintiff's state law claims are tied to Plaintiff's § 1983 claims, as the legal standard for both is based on the reasonableness of the Defendants' actions. *See Rowland*, 41 F.3d at 174 (holding that the state law claims are "subsumed within the federal excessive force claim").

Thomas already demonstrated that Defendants are not entitled to summary judgment on his § 1983 claims because they used excessive force against him; the arguments supporting Thomas's Fourth Amendment claims apply equally to his

state law claims. As the force Defendants used was excessive, Defendants are not entitled to summary judgment on Thomas's state law assault and battery claims.

## IV. DEFENDANTS MATTHEWS, BABB, GILSTRAP, AND ESTES ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THOMAS'S STATE LAW TORT CLAIMS BECAUSE THE "PUBLIC OFFICER'S IMMUNITY" DOCTRINE DOES NOT APPLY TO INTENTIONAL TORTS.

As an alternative to their argument that the force used by Defendants against Thomas was reasonable, Defendants also claim that they are "entitled to public officer's immunity as to Thomas's state law claims for assault and battery because Thomas has not shown, and cannot show, that they acted with malice." (Def. Brief 49). However, North Carolina law states that the public officer's immunity doctrine does not apply in this case. Under the doctrine, "a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for **mere negligence** in respect thereto." *Smith v. Hefner*, 235 N.C. 1, 7, 68 S.E.2d 783, 787 (1952) (emphasis added). "Public officer's immunity is not available for intentional torts." *Brown v. Winders*, No. 5:11-CV-176-FL, 2011 WL 4828840, at *6 (E.D.N.C. Oct. 11, 2011) (citing *Russ v. Causey*, 732 F. Supp. 2d 589, 612 (E.D.N.C. 2010)); *accord Bradley v. Ramsey*, 329 F. Supp. 2d 617, 626 (W.D.N.C. 2004) (no immunity for wrongful discharge, intentional affliction of emotional distress, unlawful intrusion into private affairs, and libel per se); *Mandsager v. Univ. of N.C. at Greensboro*,

269 F. Supp. 2d 662, 681 (M.D.N.C. 2003). *See also Wells v. N.C. Dept. of Corr.*, 152 N.C. App. 307, 320, 567 S.E.2d 803, 813 (2002) (no immunity for intentional affliction of emotional distress).

Defendants cite a bevy of cases that have applied the public officer's immunity doctrine to intentional torts. (Def. Brief 50–52). Defendants then rely on *Grad v. Kaasa*, 312 N.C. 310, 321 S.E.2d 888 (1984), for a purported two-pronged test for defeating public office immunity. (Def. Brief 54).[26] Thomas admits that there is a discrepancy in North Carolina law regarding the application of the public officer's immunity doctrine to intentional torts; however, Defendants' interpretation of the relevant precedent is flawed and should be disregarded for three reasons. First, although defendants claim that *Grad* "conclusively demonstrates that public officer's immunity protects officers in cases in which they are sued for intentional torts," (Def. Brief 50), the opinion does nothing of the sort. In *Grad*, a widow sued a medical examiner for performing an autopsy on her deceased husband without consent. 312 N.C. at 311, 321 S.E.2d at 889–90. *Grad* thus lacks the most important element in this discussion—an intentional tort. The tort of "interference with dead bodies," as defined by the Restatement of Torts, applies to "[o]ne who intentionally, recklessly or negligently removes, withholds,

---

[26] It is worth noting that despite Defendants' repeated use of the term in their brief, there is no evidence that a formal two-pronged "*Grad* test" has ever been recognized in North Carolina law.

mutilates or operates upon the body of a dead person." RESTATEMENT (SECOND) OF TORTS § 868 (2012). While "wrongful autopsy," as the tort is characterized in *Grad*, **can** be an intentional tort, it is not treated as such in that case. The chief controversy in *Grad* was whether the medical examiner was liable for an autopsy performed pursuant to North Carolina law if he did so without the consent of the deceased's widow. 312 N.C. at 313–315, 321 S.E.2d at 891–92. Thus the tort in that case is more properly characterized as one based in negligence or recklessness rather than intent, and *Grad* does not stand for the proposition that the public officer's immunity doctrine applies to intentional torts.

Second, *Grad* (and the other cases Defendants cite in their brief) relies on an incorrect interpretation of North Carolina law. The seminal North Carolina case on public officer's immunity is *Smith v. Hefner*. After the passage quoted *supra*, the Supreme Court of North Carolina states that "[t]he rule in such cases [of mere negligence] is that an official may not be held liable unless it be alleged and proved that his act, or failure to act, was corrupt or malicious." 235 N.C. at 7. This second passage may seem to support *Grad*, but *Hefner* makes clear that the test should **only be used in cases where public officer's immunity applies**—namely cases of "mere negligence." Further, *Grad* does not cite *Hefner* when discussing public officer's immunity; instead, both it and Defendants' brief cite *Smith v. State* for the proposition that "[a]s long as a public officer lawfully exercises the judgment and

52

discretion with which he is vested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability." 289 N.C. 313, 331, 222 S.E.2d 412, 430 (1976). The "mere negligence" language set forth in *Hefner* is absent in *Grad*, and confusingly so, as *Smith v. State* cites *Hefner* for that very proposition. *See* 289 N.C. at 331. The cited passage from *State v. Smith*, considered without the "mere negligence" language from *Hefner*, creates the impression that the "malice or corruption" test should be applied to **all** tort claims against public officials, and thus gives the public officer's immunity a much broader scope than was intended by the Supreme Court of North Carolina. Yet *Grad* and every other case cited by Defendants either contain some paraphrase of *State v. Smith*'s "as long as" language without any mention of "mere negligence"[27] or, even more inexplicably, correctly include the "mere negligence" language but then incorrectly apply the immunity doctrine to a non-negligence tort.[28] In contrast, the cases cited by Plaintiff—including *Bradley*, *Russ*, and *Wells*,

---

[27] *See Grad*, *Kitchen ex rel. Kitchen v. Halifax County*, 192 N.C. App. 559, 665 S.E.2d 760 (2008); *Thomas v. Sellers*, 142 N.C. App. 310, 542 S.E.2d 283 (2001); *Powers v. Germaine*, No. 7:06-CV-187-D, 2008 WL 2756383 (E.D.N.C. 2008); *Harrell v. City of Gastonia*, No. 3:07CV396-H, 2009 WL 234064 (W.D.N.C. 2009), *aff'd on other grounds*, 392 Fed. Appx. 197 (4th Cir. 2010); *Lea v. Kirby*, 171 F. Supp. 2d 579 (M.D.N.C. 2001).

[28] *See Strickland v. Hedrick*, 194 N.C. App. 1, S.E.2d 61 (2008) (conspiracy and malicious prosecution); *Dempsey v. Halford*, 183 N.C. App. 637, 645 S.E.2d 201 (2007) (libel and slander); *Campbell v. Anderson*, 156 N.C. App. 371, 576 S.E.2d 726 (2003) (trespass, malicious prosecution, and false arrest); *Barnett v. Karpinos*, 119 N.C. App. 719, 460 S.E.2d 208 (1995) (assault, battery, false imprisonment,

which were cited by the District Court—properly acknowledge that *Hefner*'s "mere negligence" language disallows the public officer's immunity doctrine in the case of intentional torts.

Finally, there is a simple reason that the proper interpretation of *Hefner* and *Smith v. State* is that public officer's immunity does not apply to intentional torts— such torts are inherently malicious. The legal definition of "malice" is "[t]he intent, without justification or excuse, to commit a wrongful act." *Black's Law Dictionary* (9th ed. 2009). An intentional tort is defined as "[a] tort committed by someone acting with general or specific intent." *Id.* In legal terms, "intent" and "malice" are synonymous, so an **intentional** tort is always a **malicious** tort, or one committed with malice. Even if this Court were to hold that Defendants' so-called *Grad* test applies, it should find that intentional torts, such as assault and battery, satisfy that test because they are inherently committed with malice. *See Hawkins v. State*, 117 N.C. App. 615, 630, 453 S.E.2d 233, 242 (1995) ("Because malice encompasses intent, we conclude that if a party alleges an intentional tort claim, the doctrine of qualified immunity does not immunize public officials or public employees from suit in their individual capacities.").

Thomas's state law claims consist of assault and battery, both of which are intentional torts. As they are intentional torts, the public officer's immunity

and malicious prosecution); *Bostic v. Rodriguez*, 667 F. Supp. 591 (E.D.N.C. 2009).

doctrine does not apply, and Defendants are not entitled to summary judgment on Thomas's state law claims.

## CONCLUSION

WHEREFORE, for the above-mentioned reasons, Plaintiff respectfully asks that the District Court's Order denying Defendants' motion for summary judgment be affirmed.

## REQUEST FOR ORAL ARGUMENT

Plaintiff respectfully requests oral argument to aid the Court in considering the factual and legal questions raised by this appeal.

**SHANAHAN LAW GROUP, PLLC**

By:    /s/ Kieran J. Shanahan
        Kieran J. Shanahan
        E-Mail: kieran@shanahanlawgroup.com
        Brandon S. Neuman, NCSB #33590
        E-Mail: bneuman@shanahanlawgroup.com
        John E. Branch III, NCSB # 32598
        E-Mail: jbranch@shanahanlawgroup.com
        128 E. Hargett Street, Suite 300
        Raleigh, North Carolina 27601
        Telephone: (919) 856-9494
        Facsimile: (919) 856-9499

<u>**CERTIFICATE OF COMPLIANCE**</u>

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*13,972*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>January 11, 2013</u>            <u>/s/ Kieran J. Shanahan</u>
                                            *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 11th day of January, 2013, I caused this Brief of Appellee to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> James R. Morgan
> Bradley O. Wood
> WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
> 1 West 4th Street
> Winston-Salem, North Carolina  27101
> (336) 721-3600
>
> Elizabeth F. Parsons
> NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY
> 512 North Salisbury Street
> Raleigh, North Carolina  27603
> (919) 825-2763
>
> *Counsel for Appellants*

I further certify that on this 11th day of January, 2013, I caused the required copies of the Brief of Appellee to be hand filed with the Clerk of the Court.

> /s/ Kieran J. Shanahan
> *Counsel for Appellee*